**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------------------x
                  :

In re:                  :

                  :    Chapter 15

Nortel Networks Corporation, *et al*.,    :

                  :    Case No. 09-10164 (KG)

                  :    (Jointly Administered)

Foreign Applicants in Foreign Proceedings.    :
------------------------------------------------------------------------x
                  :

NORTEL NETWORKS LIMITED,    :

                  :

    Plaintiff,         :

                  :    Adversary Proceeding

    v.              :

                  :    No. 10-53066 (KG)

COMMUNICATIONS TEST DESIGN, INC.    :

                  :

    Defendant.     :

                  :
------------------------------------------------------------------------x

## AMENDED COMPLAINT

Plaintiff Nortel Networks Limited ("**NNL**"), by its undersigned special counsel,

Buchanan Ingersoll & Rooney PC and Allen & Overy LLP, as and for its Complaint against

Defendant Communications Test Design, Inc. ("**CTDI**") alleges as follows, based on knowledge

as to itself and its own acts and on information and belief as to all other matters except as

indicated otherwise.

## PARTIES

1.    Plaintiff NNL is a subsidiary of parent company Nortel Networks Corporation

("**NNC**") with its principal business address at 5945 Airport Rd., Suite 360, Mississuaga,

Ontario, Canada.  NNC and certain of its direct and indirect subsidiaries NNL, Nortel Networks

Technology Corporation ("**NNTC**"), Nortel Networks Global Corporation ("**NNGC**") and Nortel

Networks International Corporation ("**NNIC**", collectively, "**Nortel Canada**") are in proceedings (the "**Canadian Proceedings**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") as amended before the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court").

2.      Defendant CTDI is a company organized under Pennsylvania law with its principal business address at 1373 Enterprise Drive, West Chester, PA 19380.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334(b).  This is an action for infringement of trademark pursuant to 15 U.S.C. §§ 1114 and 1116 based on CTDI's sale of counterfeit goods, and pursuant to 15 U.S.C. § 1125 for false designation of origin and dilution under the Lanham Act.

4.      Venue is proper in this district under 28 U.S.C. §§ 157(a), 1409(a) and1410.

## BACKGROUND

5.      Nortel Canada is part of a larger group of companies (the "**Nortel Companies**" or "**Nortel**").  The name Nortel is known throughout the world for leadership in the networking and communications industries.  With over 110 years of experience, the Nortel Companies operate world-wide through a highly integrated network of 143 companies.  The Nortel Companies work closely with their service providers and enterprise customers in the United States, Canada, the Caribbean and Latin America, Europe, the Middle East, Africa, and Asia to deliver them cutting edge hardware and software solutions and related services.

6.     Chapter 11 proceedings have been commenced for Nortel Networks Inc. ("**NNI**"), the Nortel Companies' primary operating subsidiary in the U.S., and certain of NNC's direct and indirect U.S. subsidiaries.

7.     On January 14, 2009, Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Nortel Canada commenced chapter 15 cases ancillary to the Canadian Proceedings and filed with the United States Bankruptcy Court for the District of Delaware petitions for recognition of foreign proceedings under chapter 15 of the Bankruptcy Code.  The Monitor's petitions for recognition were granted on February 27, 2009 pursuant to Bankruptcy Code section 1517.  These chapter 15 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure 1015(b).

### Nortel Canada's Proprietary Products, Intellectual Property, and Technical Information

8.     Prior to the bankruptcy proceedings and during the time period relevant to this action, Nortel Canada was an industry leader and innovator in the field of global telecommunications.  The manufacture and sale of telephone sets ("**Telsets**") under various Nortel tradenames were a key part of Nortel Canada's business.

9.     Nortel's innovation extended into the digital age with products including the M3900 Series Meridian Digital Telephone ("**M3900**") and the T7000 Services Taurus Digital Telephone ("**T7000**").  These models provide all of the features of Nortel's previous analog models with all of the features of a digital product such as display-based interfaces, call log, self-labeling keys, and simplified administration.  NNL holds the legal title to intellectual property embodied in and relating to these products.

10.     Each of the Telset models contains a variety of proprietary components, including but not limited to electronic chips embodying source code, silk tape, circuitry and specially designed plastics (the "**Nortel Components**").  The proprietary technology embedded in the Telsets and the Nortel Components making up the Telsets reflect years of Nortel's research and development activities.  The Nortel Components are assembled into final products according to proprietary specifications, schematics and other technical information developed by and for Nortel.  All of this technical information (the "**Nortel Know-How**") is highly valuable to Nortel Canada and was maintained as proprietary and confidential.

11.     Each of the Telsets contains a master electronic chip set, developed by Nortel for these Telsets, containing proprietary software that permits the Telsets to perform as they were designed (the "**Software**").  The Software and related documentation and specifications constitute economically valuable intellectual property rights and confidential and proprietary trade secrets.  Nortel Canada expended substantial costs and resources to develop and create the Software, which is a valuable Nortel Component.

12.     On September 17, 1996, the "NORTEL" mark was registered on the Principal Register of the United States Patent & Trademark Office as Registration No. 74233687.  Subsequent thereto, Nortel registered the NORTEL mark and a variety of other marks, including the NORTEL mark with the astrolabe design as pictured below:

**NORTEL**

and the "NORTEL NETWORKS" mark as pictured below:



on telecommunications equipment (including telephones, telephone switches, cellular mobile equipment, wireless communications products, fiber optic cable, transmission equipment), computer software, and telecommunication service (including engineering services in the field of telecommunications such as installation, maintenance, repair services, distributorship services and operational services). Nortel's right to use in commerce the NORTEL and NORTEL NETWORKS marks has become incontestable pursuant to 15 U.S.C. § 1065.

13.     The registrations of these and other well-known Nortel marks are valid, subsisting, and exclusively owned by NNL. Nortel's marks have been continually used by Nortel throughout the world and in the United States, including Delaware, on or in connection with the manufacture, distribution, sale, promotion, and servicing of its products, which includes Telsets such as the M3900.

14.     As a result of Nortel's widespread and continuous use, advertisement, promotion, and service of its products in connection with its marks, they have become widely known and recognized as identifying Nortel as the source of products and services distinguishable from other products and services.

15.     Nortel's well-known marks have come to represent and symbolize the excellent reputation of Nortel's products, services, and valuable goodwill among members of the public

throughout the world and in the United States, including Delaware. Nortel's marks have acquired a secondary meaning throughout the world and in the United States, including Delaware.

16. In order to maintain the high quality of Nortel's products, services, and customer satisfaction, Nortel sells its products through authorized Nortel distributors.

## Agreements Between NNL and CTDI

17. NNL and CTDI are parties to several licenses and agreements authorizing CTDI to gain access to and to use Nortel's proprietary intellectual property, technical information and components <u>solely</u> for the purpose of repairing existing Nortel products. CTDI was <u>not</u>, and never has been, authorized to obtain or use these rights or information or components for purposes other than those outlined in the licenses and agreements, including but not limited to the manufacture of new products from scratch or remanufacture for sale to third parties. Certain of these agreements between Nortel and CTDI are summarized below.

## A. Asset Purchase Agreement

18. On July 22, 1999, NNL (f/k/a NNC), CTDI and CTDI's subsidiary Communications Repair Logistics Company entered into an Asset Purchase Agreement (the "**APA**"). The APA provided that CTDI would purchase NNL's facility in Nashville, Tennessee (the "**Nashville Facility**") and the equipment and inventory of parts. Section 2.1(d)(7) of the APA specifically excluded from the sale "any and all Intellectual Property owned by or licensed to" NNL or any of its subsidiaries. <u>See</u> APA § 2.1(d)(7). The APA specifically required that

CTDI reorganize the Nashville Facility to provide repair services as contemplated by the APA. See APA § 5.12.

**B.      License Agreement**

19.      The rights in the APA were supported through the License Agreement between CTDI and NNL, attached as Exhibit A to the APA, which allowed CTDI to access certain intellectual property and proprietary information solely to support the repair of products.  Article 2.1 of the License Agreement explicitly provided that the license to use NNL's intellectual property was "only to the extent necessary…in connection with [CTDI's] repair of electrical and electronic or other products"  See License Agreement § 2.01.  CTDI further agreed to treat the proprietary information received from NNL in a manner that would protect its confidential nature.  See License Agreement § 3.01.  CTDI also agreed not to use the trademark "NORTEL NETWORKS" on any sales materials.  See License Agreement § 3.02.

**C.      Master Contract Repair Services Agreement**

20.      On September 1, 1999, in furtherance of CTDI's and NNL's intention that CTDI would use the Nashville Facility solely for the purpose of repairing Nortel products, CTDI and NNL entered into a Master Contract Services Agreement (the "**MCRSA**"), which was attached as Exhibit C to the APA.

21.      Pursuant to the MCRSA, CTDI obtained limited rights solely for the purpose of repairing Nortel products, and in particular to provide repair services to Nortel.  CTDI was not permitted to manufacture and distribute Nortel products into the market.  The MCRSA is clear as to the limited rights being provided to CTDI and states the expectations of the parties as follows:

1.1 Expectations

Nortel Networks has decided to contract the repair of certain of its products in the expectation that this shall enable Nortel Networks to improve Repair service time for its products, increase its ability to respond to market fluctuations and obtain greater access to "best in class" repair technologies.

MCRSA, § 1.1.

22.     In connection with the opportunity to repair Nortel products, CTDI was provided with access to NNL's confidential and proprietary information related to NNL's intellectual property, including the Nortel Know-How.  See MCRSA, § 1.2.  Section 1.3 of the MCRSA, in fact, recites that CTDI "does not have a right to use intellectual property owned by [NNL] for any purpose other than providing" the services contemplated by the MCRSA.  This limitation is further reinforced in Section 13.1 of the MCRSA, stating that CTDI would use NNL's intellectual property "solely for internal use for the purpose of performing Services"  MCRSA § 13.1 (emphasis supplied).

23.     For the avoidance of any doubt, "Services" is defined in Exhibit 1 to the MCRSA as "engineering, technical, programming, Logistics, Repair, overhaul and other functions and services provided to Nortel Networks by Contractor as set forth in the Statement of Work."  See MCRSA Exh. 1, at 45 (emphasis supplied).  The Statement of Work, in turn, crystallizes that CTDI's only authorization was to repair Nortel products for Nortel.  See MCRSA Exh. 2, "Statement of Work."  Nothing in the MCRSA, or any other agreement, permits CTDI to use Nortel's proprietary technical information or components to manufacture or remanufacture Nortel products for sale to other parties.

24.     The MCRSA also articulated, among other things, that the parts obtained from Nortel were to be used only for services to Nortel, that such materials should come only from

Nortel unless approved by NNL, and that repaired and unrepaired inventory may be sold only with NNL's consent.  See MCRSA §§ 6.3, 6.9, 8.3.

25.     In September 2007, the parties entered into an amendment to the MCRSA to address CTDI performing authorized repair of Nortel products for third parties, with the requirement that CTDI pay Nortel a royalty of 15% or 20%, depending on the type of Nortel product being repaired, on all revenue derived from such authorized repair activity.  See MCRSA, Am. 14.

26.     In executing this amendment to the MCRSA, CTDI affirmatively misrepresented and concealed its current and intended use of the licensed Nortel Know-How.  The amendment confirmed that "[CTDI] acknowledges that in its relationship as a service provider to Nortel, and in performing the Services under this Agreement, it will have access to Nortel intellectual property, including without limitation Product Information, which is owned by Nortel and which [CTDI] does not have a right to use for any purpose other than providing such Services, subject to the provisions of the [license]."  See MCRSA, Am. 14.  In fact, as Nortel discovered later and as detailed below, CTDI knew that its representations to Nortel were false.

27.     In truth, before, during, and after CTDI affirmed that it did and does not have a right to use Nortel's intellectual property and product information "for any purpose other than" providing authorized repair services, CTDI was using Nortel's intellectual property and product information for other, unauthorized purposes – the remanufacture and manufacture of "Nortel" products and sale of such products to other parties.  By acknowledging its contractual obligations to not use Nortel's proprietary technology for any other purposes and concealing that it was

intentionally breaching that obligation, CTDI was able to maintain its scheme of improperly using that technology and the Nortel trademarks.

**D.      Alliance Agreement**

28.      On February 22, 2006, CTDI and NNL entered into an Alliance Agreement (the "**Alliance Agreement**").  The Alliance Agreement established and defined business processes in support of the parties' joint marketing and supply of repair services to certain customers.  The objectives of the Alliance Agreement are specifically enumerated as relating only to repair and maintenance services, and to increasing the volume of products repaired by CTDI.  Nothing in the Alliance Agreement allowed CTDI to manufacture Nortel products.  <u>See</u> Alliance Agreement § 1.1 "Objectives of Alliance."

**E.      Technical Information License Agreement**

29.      In connection with the Alliance Agreement, also on February 22, 2006, NNL and CTDI executed a Technical Information License Agreement (the "**TILA**") in which NNL granted CTDI a limited license to use certain Nortel Know-How.  The TILA made clear that CTDI could use Nortel Know-How "solely for the provision of Licensed Services," TILA § 2.1(d), which was, by definition, limited to the "Repair" of Nortel's products.  <u>Id</u>. at § 1(1). Further, Article 2.5 of the TILA provides that NNL "reserves all rights and licenses not expressly granted in this Agreement, and nothing in this Agreement shall be construed as implying or give rise to any implied grant of license of any right not expressly set forth in" the TILA.  <u>Id</u>. at § 2.5.

30.      In the TILA, CTDI acknowledged that the Nortel Know-How licensed to it for purposes of the repair of Nortel's products was confidential, proprietary information that CTDI

was required to keep confidential and to use only within the limited scope specified in the TILA. See TILA at § 2.3. Further, CTDI specifically acknowledged and agreed that CTDI did not have the right to use the licensed Nortel Know-How and proprietary information for the remanufacture or refurbishment of Nortel products. See TILA, § 2.5. The TILA defines "Remanufacture or Refurbishment" as "the process of repairing second hand or grey market units or products for the purpose of passing off or selling such units or products as Nortel Networks products or otherwise."

31.     In signing the 2006 Alliance Agreement and TILA, CTDI again affirmatively misrepresented its current and intended use of the licensed Nortel Know-How. CTDI purposefully concealed the fact that it was already making and selling Telsets into the market and improperly using Nortel trademarks and would continue doing so, despite its express acknowledgment that its agreements with Nortel prohibited it from doing so.

**CTDI's Improper Manufacture and Sale of Nortel Telsets and Circuit Packs**

32.     In June 2008, Nortel was contacted by a company that had purchased what it thought were authentic, new "Nortel" Telsets from Atlanta Telephone Company ("**ATC**"). The order was for 3700 units of allegedly Nortel M3900 telephone product. Promptly after receiving a partial shipment of the telephone sets, however, the purchaser recognized that the units were not genuine Nortel products. Specifically, the purchaser noted that the boxes were different from new Nortel Telset boxes, the labels were different, the part numbers were different (and listed discontinued parts), and the Nortel hologram – the seal of an authentic Nortel product – was missing.

33.     The purchaser contacted ATC to complain that the products were not the new Nortel Telsets they ordered. ATC responded via email, insisting that the telephone sets were new according to the manufacturer and not "remans" (remanufactured telephones).

34.     Soon after Nortel was contacted by ATC, Nortel investigators examined the telephone sets and confirmed several differences between the products sold by ATC and genuine Nortel products:

- The box containing the counterfeit telephone sets was dated 2007/09/08, and stated that the telephones were manufactured in "Montery" [*sic*]. Nortel has not manufactured telephone sets in Monterrey since 2002.

- The telephone sets failed to include the holographic label identifying them as authentic Nortel Telsets.

- The bar code labels on the back cover of the telephone sets were oversized and accompanied by two additional labels. This method of labeling was not standard Nortel practice.

- The foam covering the speaker of the telephone set was of different density and had a clear acoustic septum rather than the white one used on an authentic Nortel Telset.

35.     Based on this information, the District Court for the Northern District of Georgia granted Nortel's request on September 22, 2008 to raid ATC and to search the premises and seize all counterfeit Nortel products from ATC. In addition to surrendering a large volume of counterfeit products, ATC cooperated with Nortel and informed them that the telephone sets had been purchased from a company called SWB of Nashville, Inc. ("**SWB**").

36.     Armed with this evidence from ATC, Nortel initiated litigation against SWB in the District Court for the Eastern District of Tennessee in October 2008. The Tennessee District Court granted Nortel's request for a surprise search and seizure of SWB in order to preserve

evidence regarding the source of the counterfeit telephone sets. Nortel learned that the counterfeit telephones sold to ATC came from CTDI.

37.     Based on this information, Nortel exercised its audit rights under the MCRSA in order to obtain additional information from CTDI. The MCRSA provides that NNL has the right to review CTDI's records and, accordingly, Nortel requested such an audit on September 28, 2009. CTDI delayed complying with the request, and ultimately provided only limited information. The limited information provided by CTDI, however, established that CTDI had ordered parts from Nortel suppliers under the guise of using them for authorized repair activities. However, the number of parts ordered was far higher than required for CTDI's authorized activities.

38.     Thus, the information established that, on an extremely large scale, CTDI was willfully violating Nortel's rights by fraudulently obtaining proprietary Nortel components, under the guise of using them for authorized repair activity and then improperly using proprietary Nortel technical information to assemble these fraudulently-obtained components into new products or remanufactured Telsets for sale to third parties under the "Nortel" name.

39.     Nortel was not aware of CTDI's impropriety, because CTDI repeatedly and purposefully concealed its fraudulent activities. To perpetuate its fraud, CTDI procured proprietary Nortel components under the pretense of using them for authorized repair activities, while actually using them to manufacture and remanufacture products for sale to other parties; filed false royalty reports that were supposed to disclose its activities using Nortel's intellectual property, components and know-how, but that concealed CTDI's improper manufacture of fake "Nortel" products; and repeatedly signed agreements with Nortel, including the agreements

described above, that acknowledged and affirmed that CTDI was permitted to use Nortel's intellectual property, components and know-how only for repairing phones, when CTDI was actually using Nortel's proprietary information to manufacture and remanufacture knock-off Telsets for sale to other parties.

40.     Nortel Canada's investigation of CTDI's large-scale operation has only begun, but the limited information collected so far shows that from 2005 to 2009, CTDI's revenues from its improper and unlawful sales of unlicensed "Nortel" products totaled more than $30 million through sales to over 40 different customers.  Beyond CTDI's unjust enrichment, Nortel suffered direct loss of the profits it would have earned from selling the units that CTDI improperly sold, in an estimated amount exceeding $44 million.

41.     In addition, Nortel's audit of CTDI revealed that CTDI sold in excess of $30 million of Nortel circuit packs used in other Nortel products.  The circuit packs include line cards, voice or data port cards, trunk cards, CPU's, memory packs, I/O cards (together the "**Nortel Circuit Packs**").  Just as with the other Nortel agreements, CTDI was permitted to procure Nortel Circuit Packs solely for the purpose of using them to repair Nortel products.  However, upon information and belief, CTDI employed Nortel Know-How and technology to perform work and testing on Nortel Circuit Packs and improperly sold Nortel Circuit Packs into the market.  Further, CTDI willingly failed to pay any royalties to Nortel for these Nortel Circuit Packs or otherwise compensate Nortel for them.

## COUNT I

### (Misappropriation of Trade Secrets)

42.     NNL repeats and realleges each allegation set forth in paragraphs 1 through 41 above as if fully set forth herein.

43.     CTDI's conduct constitutes a willful and malicious misappropriation of NNL's trade secrets.

44.     The Nortel Know-How and trade secrets have a substantial independent economic value, because they are not generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

45.     NNL has maintained the Nortel Know-How and trade secrets as secret, confidential and proprietary information.

46.     In selling manufactured and remanufactured products to other parties, as opposed to providing authorized repair services on Nortel products, CTDI misappropriated Nortel Know-How and trade secrets in a manner that was not permitted, and that CTDI plainly knew was not authorized.  In addition, CTDI improperly employed Nortel Know-How and technology to perform work and testing on Nortel Circuit Packs and sold Nortel Circuit Packs into the market, without compensating Nortel.

47.     CTDI's misappropriation of the Nortel Know-How and trade secrets was willful, and CTDI clearly knew it was not authorized by NNL.

48.     Additionally, CTDI employed Nortel Know-How and technology to perform work and testing on Nortel Circuit Packs and improperly sold Nortel Circuit Packs into the market without compensating Nortel.

49.     NNL has been damaged as a result of CTDI's conduct, and seeks damages in accordance with proof at trial, but in any event sufficient to: (1) compensate it for its actual losses, including lost profits resulting from CTDI's misappropriation of trade secrets, and (2) recover the amounts that CTDI unjustly received as a result of its misappropriation of trade secrets.

50.     Because CTDI's misappropriation was willful and malicious, NNL is entitled to recover exemplary damages in an amount equal to twice the damages otherwise recoverable, and to recover its attorneys' fees and costs of suit.

## COUNT II
### (Trademark Infringement - 15 U.S.C. §§ 1114 & 1116)

51.     NNL repeats and realleges each allegation set forth in paragraphs 1 through 50 above as if fully set forth herein.

52.     NNL has long used several trademarks including, but not limited to, the NORTEL® mark with the astrolabe design and the NORTEL NETWORKS® mark.  NNL is the owner of these world famous marks.

53.     Nortel sells its products with one or more of these famous marks through its authorized distributors and authorized channels.

54.     NNL's marks have come to represent and symbolize the excellent reputation of Nortel's products, services, and valuable goodwill among members of the public and in the United States, including Delaware.

55.     In deliberate violation of NNL's ownership of the Nortel trademarks, CTDI has offered for sale, sold and distributed in this District and perhaps elsewhere, under the Nortel trademarks, products that are materially different from genuine Nortel products. Thus, Defendants' sales of non-genuine Nortel products constitute counterfeiting under 15 U.S.C. § 1116.

56.     Defendant has offered for sale, and sold, non-genuine Nortel products under the "Nortel" trademarks falsely representing them as new products, authorized for sale by Nortel.

57.     CTDI's acts have caused Nortel and the public to suffer great and irreparable damage and injury through, *inter alia*, (1) a likelihood of confusion, mistake, and deception among the relevant purchasing public and trade, and (2) the loss of Nortel's valuable goodwill and business reputation symbolized by Nortel's marks.

58.     CTDI's unauthorized used of the Nortel marks in commerce constitutes infringement of NNL's rights in and to the Nortel mark in violation of 15 U.S.C. § 1114.

59.     Upon information and belief, as a result of CTDI's unlawful activities, CTDI received and will continue to receive substantial profits to which it is not entitled, and Nortel Canada has or will suffer actual monetary damages, including lost profits and impairment of the value of the Nortel mark.

60. Upon information and belief, CTDI has acted with full knowledge of NNL's rights and with the intention to usurp such rights. The aforementioned acts of CTDI are therefore intentional, willful, and were calculated to cause confusion, to cause mistake, or to deceive. As a result, CTDI should be held liable to NNL for treble damages and attorneys' fees pursuant to 11 U.S.C. §1117(b).

## COUNT III
### (Dilution of Famous Mark - 15 U.S.C. § 1125)

61. NNL repeats and realleges each allegation set forth in paragraphs 1 through 60 above as if fully set forth herein.

62. The Nortel trademarks, as described above, are extremely strong and well-recognized. As such, these marks are considered "famous marks" within the meaning of 15 U.S.C. § 1125(c).

63. CTDI's unlawful activities as described above, including unauthorized sales of inferior non-genuine products bearing the Nortel marks has diluted the value of Nortel's famous marks.

64. CTDI's unauthorized sale of counterfeit Nortel products has blurred and/or tarnished Nortel's famous trademarks, and has decreased the selling power of such marks.

65. Since CTDI's conduct was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, NNL is also entitled to recover monetary damages, treble damages, and attorneys' fees.

## COUNT IV
### (False Designation of Origin - 15 U.S.C. § 1125(a))

66.     NNL repeats and realleges each allegation set forth in paragraphs 1 through 65 above as if fully set forth herein.

67.     CTDI's sales of counterfeit Nortel products by improperly using the Nortel marks constitutes use of a false designation of origin or false and misleading representation in interstate commerce that wrongfully associates and/or leads the public to believe that Nortel is connected, affiliated, associated with Defendants, and/or that Nortel sponsors or approves the inferior non-genuine products sold by Defendants.

68.     CTDI's false designations have caused NNL to suffer irreparable injury and damages, in an amount to be proven at trial.

## COUNT V
### (Breach of Contract)

69.     NNL repeats and realleges each allegation set forth in paragraphs 1 through 68 above as if fully set forth herein.

70.     Under the APA, License Agreement, MCRSA, Alliance Agreement and TILA, and in consideration of same, CTDI agreed not to use or disclose NNL's proprietary and confidential information, including trade secrets and intellectual property, for any purpose outside of those specified.

71.     The APA, License Agreement, MCRSA, Alliance Agreement and TILA are lawful and enforceable contracts, and their provisions are still in full force and effect.

72. NNL has complied with the APA, License Agreement, MCRSA, Alliance Agreement and TILA.

73. On information and belief, CTDI has breached and will continue to breach the APA, License Agreement, MCRSA, Alliance Agreement and TILA by, *inter alia*, using NNL's proprietary and confidential information and the Nortel Know-How and trade secrets and intellectual property for the benefit of itself, and in a manner not contemplated by the APA, License Agreement, MCRSA Alliance Agreement and TILA.

74. Further, CTDI improperly employed Nortel Know-How and technology to perform work and testing on Nortel Circuit Packs and sold Nortel Circuit Packs into the market rather than using them to repair existing Nortel products.

75. NNL has been damaged as a result of CTDI's breaches, and seeks damages in accordance with proof at trial, but in any even sufficient to: (1) compensate it for its actual losses including lost profits resulting from CTDI's breaches, and (2) recover the amount by which CTDI was unjustly enriched as a result of its breaches.

## COUNT VI
### (Breach of Covenant of Good Faith and Fair Dealing)

76. NNL repeats and realleges each allegation set forth in paragraphs 1 through 75 above as if fully set forth herein.

77. As detailed above, in its dealings with NNL, CTDI breached the implied covenant of good faith and fair dealing by using NNL's intellectual property, including the Nortel Know-How and proprietary technical information and components for purposes not permitted by the License Agreement or the TILA.

78.     NNL has been damaged as a result of CTDI's breach and seeks damages in an amount in accordance with proof at trial, but in any event sufficient to: (1) compensate it for its actual losses including lost profits resulting from CTDI's breaches, and (2) recover the amount by which CTDI was unjustly enriched as a result of its breaches.

## COUNT VII
### (Fraud)

79.     NNL repeats and realleges each allegation set forth in paragraphs 1 through 78 above as if fully set forth herein.

80.     On numerous occasions CTDI represented to NNL that it would use NNL's intellectual property, including, without limitation, trade secrets and the Nortel Know-How and proprietary and confidential information solely for the purpose of repairing Nortel products.

81.     NNL was entitled to rely on CTDI's representations, and did reasonably rely on these representations.  Upon information and belief, CTDI's representations were knowingly false.

82.     In addition, CTDI fraudulently obtained proprietary Nortel components, which embody proprietary Nortel intellectual property, under the guise of using these components for authorized repair activity, while concealing that CTDI was using these components for the unauthorized manufacture of telephone sets and remanufacture of products for sale to other parties.  CTDI knew that Nortel would not permit CTDI to use these components for such activities, and therefore it fraudulently concealed its true purpose and activities from Nortel.

83.     Further, CTDI fraudulently misled Nortel by providing royalty reports that purported to reflect CTDI's activity using proprietary Nortel Know-How and components, but that concealed CTDI's manufacture and remanufacture of products for sale on a vast scale.

84.     CTDI knew that the representations described above were false, and it intended Nortel to rely on the false representations and the concealing of the truth in order the enable CTDI to procure proprietary Nortel components and to continue gaining access and the ability to use Nortel Know-How.

85.     In permitting CTDI to obtain such proprietary Nortel components and to gain access to and use proprietary Nortel Know-How and NNL technical information and intellectual property concerning the implementation of these components, Nortel relied on CTDI's misrepresentations as described above.

86.     CTDI's knowing and willful acquisition of these components for unauthorized purposes constitutes fraud.

87.     CTDI's fraudulent activities have harmed Nortel Canada, including by enabling CTDI to make and sell tens of millions of dollars of Nortel products in competition with Nortel, and has caused NNL damages in an amount to be established in accordance with proof at trial.

## COUNT VIII
### (Unjust Enrichment)

88.     NNL repeats and realleges each allegation set forth in paragraphs 1 through 87 above as if fully set forth herein.

89.     Benefits have been conferred upon CTDI by CTDI's unauthorized use of the Nortel mark.

90.     CTDI has appreciated, accepted and retained these benefits.

91.     It is inequitable for CTDI to retain these benefits without the payment of consideration for their value to NNL.

92.     CTDI has been unjustly enriched at the expense of NNL.

93.     CTDI's activities as described above constitute unjust enrichment under the common law of the state of Delaware.

**PRAYER FOR RELIEF**

WHEREFORE, NNL requests the following relief:

(a)     Entry of judgment holding CTDI liable for willful and malicious misappropriation of NNL's trade secrets, breach of contract, breach of the covenant of good faith and fair dealing, fraud and unjust enrichment;

(b) An award of damages according to proof, including without limitation lost profits and amounts by which CTDI has been unjustly enriched, together with pre-judgment and post-judgment interest to NNL;

(c)     An award of exemplary and punitive damages and attorneys' fees in light of the willful and malicious nature of CTDI's misconduct and misappropriation;

(d)     Entry of judgment holding CTDI liable for trademark infringement in violation of 15 U.S.C. §§ 1114 and 1116, dilution of famous mark in violation of 15 U.S.C. § 1125 and false designation of origin in violation of 15 U.S.C. § 1125;

(e)     An award of monetary damages, treble damages and attorneys' fees in connection with the trademark infringement, dilution of famous mark, and false designation of origin causes of action;

(f)     Any additional legal and equitable relief that may be available under law and that the court may deem proper.

Dated: November 12, 2010
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

    /s/ Mona A. Parikh
Mary F. Caloway, Esq. (No. 3059)
Mona A. Parikh (No. 4901)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, Delaware 19801
(302) 552-4200 (Telephone)
(302) 552-4295 (Facsimile)
Email: mary.caloway@bipc.com
        mona.parikh@bipc.com

and

**ALLEN & OVERY LLP**
Ken Coleman, Esq. (admitted *pro hac vice*)
Jessica D. Lubarsky, Esq. (admitted *pro hac vice*)
Laura Hall, Esq. (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300 (Telephone)
(212) 610-6363 (Facsimile)

*Special Counsel for Nortel Networks Limited*